# In the United States Court of Federal Claims

<table>
<tr><td>

LAWRENCE RASHUAN JEANPIERRE, IV,

    *Plaintiff,*

v.

THE UNITED STATES,

    *Defendant.*

</td><td>

No. 22-471
(Filed: March 25, 2025)

</td></tr>
</table>

*James Hardwick*, Cornell Law School Veterans Law Practicum, Ithaca, NY, for Plaintiff.

*Liridona Sinani*, Civil Division, United States Department of Justice, Washington, DC, with whom was Whitney L. Whiles, U.S. Army JAG Corps, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge.*

Plaintiff, Mr. Lawrence Jeanpierre, served honorably in the United States Army from 2009 to 2013. During his last year of service, he frequently received treatment for mental health conditions and was diagnosed with adjustment disorder. In the ten months after his discharge, he was hospitalized multiple times and, in addition to adjustment disorder, was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), schizophrenia, schizoaffective disorder, depressive disorder not otherwise specified ("NOS"), major depressive disorder with psychosis, psychosis NOS, and anxiety disorder NOS.

In 2017, Mr. Jeanpierre requested that the Army Board for Correction of Military Records ("ABCMR" or "the Board") correct his records to reflect that he was medically retired based on disability. The Board first rejected his application on July 1, 2019 and again after reconsideration on January 6, 2021. Mr. Jeanpierre then filed the present action on May 2, 2022.

At the parties' request, the Court remanded the case to the Board on April 27, 2023, after Defendant acknowledged that the Board did not properly apply governing Department of Defense ("DoD") regulations to the case. On remand, the ABCMR found that Mr. Jeanpierre had PTSD and adjustment disorder while in the Army, but that these conditions did not make him unfit for service. Thus, he was not entitled to medical disability retirement. Mr. Jeanpierre contends that the Board erred in finding that he was fit for duty at the time of his separation.

The case is now before the Court on the parties' cross-motions for judgment on the administrative record. Having reviewed the administrative record,[1] the relevant filings, and the parties' arguments at oral argument, the Court concludes that the Board's determination that Mr. Jeanpierre was fit to perform the duties of his office, grade, rank, or rating was arbitrary, capricious, and contrary to law. Defendant's decision did not adequately apply the principles of liberal consideration required by DoD guidance and 10 U.S.C. § 1552(h)(2). And because the ABCMR failed to both sufficiently consider the evidence in this case and explain its reasoning, its decision is not supported by substantial evidence.

Therefore, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record. Pl.'s Mot. for J. on the Admin. R. (hereinafter "Pl.'s MJAR"), ECF No. 59. The Court **DENIES** Defendant's Amended Cross-Motion for Judgment on the Administrative Record. Def.'s Am. Cross-Mot. for J. on the Admin. R. (hereinafter "Def.'s MJAR"), ECF No. 61. The case is **REMANDED** to the Board for consideration of all the evidence of record and any additional evidence Mr. Jeanpierre may submit on remand. The Board shall reconsider its findings to ensure its conclusions and analysis are consistent with this Opinion and clearly apply the principles of liberal consideration as set forth below.

## I.    Statutory and Regulatory Background

Soldiers may be eligible for two types of post-service disability benefits: military disability retirement pay and veteran disability benefits. Along with the Army's Physical Disability Agency, the DoD administers military disability retirement pay. *See* 10 U.S.C. § 1201; Department of Defense Instruction (hereinafter "DoDI") 1332.38 (July 10, 2006); Department of Defense Directive (hereinafter "DoDD") 1332.18; Army Reg. 635-40.[2] To be eligible for disability retirement pay, a service member must have become disabled while serving on active duty. 10 U.S.C. §§ 1201–1221; *see also Chambers v. United States*, 417 F.3d 1218, 1223 (Fed. Cir. 2005). "Disability compensation is not an entitlement acquired by reason of service-incurred illness or injury." Army Reg. 635-40 ¶ 3-2 (b)(1). Rather, it is reserved for soldiers whose service is interrupted to such an extent that they can no longer reasonably serve. *Id.*

If a service member is not considered or rejected for disability retirement prior to separation from the Army, military review boards such as the ABCMR may determine retroactively whether the soldier should have been medically retired. *LaBonte v. United States*, 43 F.4th 1357, 1361 n.4 (Fed. Cir. 2022) (citing *Chambers*, 417 F.3d at 1225). The Board

---

[1] Defendant filed the Administrative Record in two parts on August 15, 2022 and December 15, 2023. Admin. R. (hereinafter "AR"), ECF Nos. 11 & 42. The filings are consecutively paginated. References to the Record follow the page numbers assigned by the government.

[2] The Army and DoD regulations cited throughout this Opinion and Order refer to the regulations in effect at the time of Mr. Jeanpierre's discharge in February 2013. Defendant appended all the cited Army Regulations and the DoDD 1332.18 to its Amended Cross-Motion for Judgment on the Administrative Record. *See generally* ECF No. 61-1. These are the versions to which the Court cites. Defendant did not include the DoDI 1332.38, so the Court cites to the version reissued on July 10, 2006.

provides the highest level of administrative review within the Department of the Army.  *Sanders v. United States*, No. 23-103C, 2023 WL 6307661, at *4 (Fed. Cl. Sept. 28, 2023), *aff'd*, No. 2024-1067, 2025 WL 313171 (Fed. Cir. Jan. 28, 2025) (citing 32 C.F.R. § 581.3(d)(3)); Army Reg. 635-40 ¶ 2-12.

To receive military disability retirement, a service member must (1) have a disability that (2) permanently renders him "unfit to perform the duties of [his] office, grade, rank, or rating," and (3) his "disability [must be] at least 30 percent under the standard schedule of disabilities in use by the Department of Veterans Affairs."  10 U.S.C. § 1201(a); 10 U.S.C. § 1201(b)(3)(B). *See also Jones v. United States*, 30 F.4th 1094, 1097 (Fed. Cir. 2022).

### A.    Post Hoc Disability Determinations

In making a post service disability determination, the ABCMR must first decide whether a veteran was disabled at the time of his separation from service and then assess whether any existing mental or physical disabilities made him unfit for service.  To qualify for benefits, the Board must find that the disability is permanent, incurred while on active duty, and not the result of intentional misconduct.  DoDD 1332.18 ¶ 3.3.1.2–3.3.3.

Congress requires military review boards to apply a liberal consideration standard when evaluating the correction application of a soldier who has experienced military sexual assault or suffered from traumatic brain injury or PTSD.  10 U.S.C. § 1552(h); *Doyon v. United States*, 58 F.4th 1235, 1242 (Fed. Cir. 2023).  This standard is retroactive.  *Kelly v. United States*, 69 F.4th 887, 889 (Fed. Cir. 2023) (citing *Doyon*, 58 F.4th at 1245).  Various DoD memoranda also direct review boards to apply the liberal consideration standard when considering applicants for disability pay related to service-connected mental disabilities.  *See* Memorandum from Under Secretary of Defense A.M. Kurta to Secretaries of the Military Departments (Aug. 25, 2017) (hereinafter "Kurta Memo"); Memorandum from Secretary of Defense Charles Hagel to Secretaries of the Military Departments (Sept. 3, 2024) (hereinafter "Hagel Memo"); Memorandum from Under Secretary of Defense Robert L. Wilkie to Secretaries for the Military Departments (July 25, 2018) (hereinafter "Wilkie Memo").  Boards are required to evaluate claims related to service-connected behavioral health issues under a more magnanimous standard because "[i]nvisible wounds . . . are some of the most difficult cases [boards] review."  Kurta Memo; *see also Kelly*, 69 F.4th at 891 n.3 (explaining the historical context of the change to the liberal consideration standard).

At minimum, the liberal consideration standard is a relaxed evidentiary standard.  *See Bee v. United States*, No. 21-1970, 2024 WL 3912596, at *9 (Fed. Cl. Aug. 23, 2024) ("[L]iberal consideration may in certain cases alleviate a claimant from the normal burden of proof.").  The ABCMR should consider evidence outside of the four corners of the service record, including changes in behavior, deterioration in work performance, inability of an individual to conform his behavior to the expectations of a military environment, substance abuse, episodes of depression, panic attacks or anxiety, unexplained social behavior changes, or relationship issues.  Kurta Memo Attach. at 1.  And "[e]vidence that may reasonably support more than one diagnosis should be liberally considered as supporting a diagnosis, where applicable, that could excuse or mitigate the discharge."  *Id.* at 2.

Further, the guidance requires the ABCMR to consider the diagnoses of licensed psychiatrists or psychologists who have evaluated the veteran.  *Id.*  The "veteran's testimony

alone, oral or written, may establish the existence of a condition or experience." *Id.* Department of Veterans Affairs ("VA") determinations that a veteran's health condition existed during service are not binding, but they are "persuasive evidence that the condition existed or experience occurred during military service." *Id.* Finally, "[c]onditions or experiences that may reasonably have existed at the time of discharge will be liberally considered as excusing or mitigating the discharge." *Id.*

These liberal evidentiary standards are necessary in cases concerning PTSD because "veterans' records frequently did not include sufficient 'substantive information' concerning PTSD to make a diagnosis." *Thomas v. United States*, No. 22-590C, 2025 WL 482164, at *13 (Fed. Cl. Feb. 13, 2025) (citing Hagel Memo). The DoD recognized that it would be "unreasonable to expect the same level of proof for injustices committed years ago when . . . mental health conditions such as PTSD . . . were far less understood than they are today." Kurta Memo Attach. at 3.

### B.    Fitness for Service

When a service member separates from the Army for reasons other than physical disability, the Army presumes that he is fit. Army Reg. 635-40 ¶ 3-2(b)(2). "The mere presence of an impairment does not, of itself, justify a finding of unfitness because of physical disability." *Id.* at ¶ 3-1; DoDI 1332.38 E.3 P.3 ¶ 3.4. In other words, a service member may suffer from a medical issue or malady and still be fit for service. "Regardless of the presence of illness or injury, inadequate performance of duty, by itself, shall not be considered evidence of unfitness due to disability, unless it is established that there is a cause and effect relationship between the two factors." DoDI 1332.38 E.3 P.3 ¶ 3.4. *See also* Army Reg. 635-40 ¶ 3-1(c).

Similarly, while a VA rating is "relevant evidence in determining whether [a] plaintiff was unfit for duty," its existence is not enough on its own to show that a service member was unfit at the time of his separation. *Valles-Prieto v. United States*, 159 Fed. Cl. 611, 618 (2022) (citing *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)). *See also Kelly*, 69 F.4th at 889.

A review board must consider all relevant evidence when evaluating a soldier's fitness, and all findings related to fitness are made on a preponderance of the evidence standard. Army Reg. 635-40 ¶ 3-1(c). A service member may be considered fit for duty "if the evidence establishes the fact that the Soldier adequately performed the normal duties of his or her office, grade, rank, or rating until the time of referral for physical evaluation" even though "medical evidence indicates the Soldier's physical ability to perform such duties may be questionable." *Id.*

The presumption of fitness may be overcome in at least two ways. First, a soldier is unfit when evidence establishes that either his "condition represents a decided medical risk to the health of the member or the welfare or safety of other members" or his "condition imposes unreasonable requirements on the military to maintain or protect the member." DoDI 1332.38 E.3 P.3 ¶ 2.2.1–2.2. Second, a service member is unfit if he was actually disabled and unable to perform his duties and there is either "a causative relationship between the less than adequate duty performance and the unfitting medical condition" or "[a]n acute, grave illness or injury or other significant deterioration of the Soldier's physical condition occurred immediately prior to, or coincident with processing for separation . . . and rendered the Soldier unfit for further duty."

Army Reg. 635-40 ¶ 3-2 (b)(2)(a)–(b).  *See also Kelly*, 69 F.4th at 889 (citing 10 U.S.C. § 1201);
DoDI 1332.38 E.3 P.3 ¶ 2.1.

Once the ABCMR determines that a veteran had a disability, it must decide if that
disability made him unfit.  There is some debate about whether the Board is required to apply
liberal consideration to this determination.  Defendant argues that "liberal consideration is
limited to 'discharge' relief provided by correction boards . . . and not applicable to underlying
determinations of fitness and medical disability which are conducted under a different statutory
and regulatory regimen."  Def.'s MJAR at 7–8 (citing Ashish S. Vazirani, *Clarifying Guidance
to Boards for Correction of Military/Naval Records Considering Cases Involving Both Liberal
Consideration Discharge Relief Requests and Fitness Determinations* (April 4, 2024)).  Plaintiff
disagrees.  Pl.'s Reply at 5, ECF No. 64.  Some cases from this Court have found that liberal
consideration should apply to fitness claims.  *See, e.g.*, *Thomas*, 2025 WL 482164, at *14 n.10
(stating that 10 U.S.C. 1552(h) makes clear "that principles of liberal consideration do apply to
fitness claims").  Here a finding on this issue is not necessary since in Mr. Jeanpierre's case, the
ABCMR professed to apply liberal consideration to its fitness evaluation.  Tab 22 at AR 780.
Thus, the Court assumes the Board should have applied liberal consideration to the fitness
determination.

If the Board concludes that a veteran may have been unfit, it refers the soldier to the
Defense Evaluation System ("DES").[3]  *See* DoDD 1332.18 ¶ 3.1–3.2.  Generally, in the DES
process, a Medical Evaluation Board ("MEB") determines whether, at the time of his discharge,
the soldier met medical retention standards.  Army Reg. 635-40 ¶ 3-1(a); *see also Walls v.
United States*, 582 F.3d 1358, 1365 (Fed. Cir. 2009); *LaBonte*, 43 F.4th at 1362 n.7.  Then, the
Physical Evaluation Board ("PEB") determines whether the soldier is fit for duty by evaluating
his disability against the physical requirements of the soldier's duties, rank, and skill level.
Army Reg. 635-40 ¶ 4-17(b), ¶ 5-2b.  *See also Keltner*, 165 Fed. Cl. at 488–90.  If the PEB finds
the service member was unfit for service at the time of discharge, it then must weigh whether he
should receive medical disability retirement or severance pay.  Army Reg. 635-40 ¶ 4-17(a)(4)
(explaining purpose and composition of the PEB).  *See generally Walls*, 582 F.3d at 1366
(citation omitted) (explaining that the MEB evaluates and reports on a soldier's diagnosis,
prognosis for return to full duty, plan for further treatment or convalescence, and then makes a
"medical recommendation for disposition of such members").

Army regulations guide referral to the MEB for certain conditions.  For example, soldiers
suffering from mood disorders, anxiety, or dissociative disorders must also suffer from persistent
or recurrent symptoms that either (a) require an "extended or recurrent hospitalization," (b)
necessitate "limitations of duty or duty in a protected environment," or (c) interfere with
"effective military performance."  Army Reg. 40-501 ¶ 3-32 (Mood disorders); *id.* at ¶ 3-33
(Anxiety, somatoform, or dissociative disorders).  Service members experiencing disorders with
psychotic features should be referred to the MEB if their conditions "fail to respond to treatment

---

[3] The DES comprises the Legacy Disability Evaluation System ("LDES") and the Integrated
Disability Evaluation System ("IDES").  *Keltner v. United States*, 165 Fed. Cl. 484, 489 (2023)
(citation omitted).  In the LDES, the DoD alone evaluates whether the service member should
receive medical retirement benefits for his illness, while in the IDES process, the DoD and the
VA together determine whether the soldier should receive benefits.  *Id.*  Typically cases proceed
through the IDES pathway.  *Id.*

or restore the Soldier to full function within 1 year of onset of treatment" or the disorder causes "gross impairment in reality testing, resulting in interference with social adjustment or with duty performance." *Id.* at ¶ 3-31. Adjustment disorders "do not render an individual unfit because of physical disability, but may be the basis for administrative separation if recurrent and causing interference with military duty." *Id.* at ¶ 3-36. *See also LaBonte v. United States*, No. 18-1784C, 2023 WL 3197825, at *8, *10 (Fed. Cl. May 2, 2023) (noting that a diagnosis of adjustment disorder could still warrant referral to a MEB for further evaluation).

## II.    Findings of Fact

Mr. Jeanpierre began his active-duty service with the Army on February 3, 2009. Tab 22 at AR 761. In the Army, Mr. Jeanpierre served as an Automated Logistic Specialist. Tab 12 at AR 586; Tab 18 at AR 681 (Army Military Human Resource Record). "Similar to a laborer or a freight mover," enlisted Automated Logistic Specialists "perform maintenance management and warehouse functions in order to maintain equipment records." [4] During his four years of service, he deployed to Mazar Al Sharif, Afghanistan as part of Operation Enduring Freedom from March 7 to December 8, 2011. Tab 22 at AR 761, 765; Pl.'s MJAR at 9. At the time of his discharge, he held a rank of Specialist (E04). Tab 12 at AR 585 (DD Form 214); Tab 16 at AR 619; Tab 18 at 681.

In his last year of service, Mr. Jeanpierre began to experience issues with his mental health. *See, e.g.*, Tab 4 at AR 34; Tab 22 at AR 778. In Afghanistan, Mr. Jeanpierre reports that he "saw a lot of difficult stuff" while he was deployed and "was constantly on edge." Tab 12 at AR 586 (Plaintiff's Affidavit); Tab 5 at 75 (same). He worked at the entry control point to his base. Tab 12 at AR 586. Specifically, Mr. Jeanpierre recalls a traumatic event where he discovered a black box with wires that he believed at the time was an improvised explosive device ("IED"). *Id.* The device turned out to be benign, but the experience greatly impacted him. *Id.* It set the tone for the rest of his deployment. *Id.*

In addition to his experience with this potential IED, the record shows Mr. Jeanpierre reported experiencing enemy fire and that his close friend committed suicide. Tab 5 at 51 (statement of Veteran's Administration psychiatrist Raymond Cho); Pl.'s MJAR at 9–10. While in the military, Mr. Jeanpierre was not diagnosed with PTSD or schizophrenia—although VA psychiatrists subsequently diagnosed him with both conditions shortly after leaving the Army and found that his psychiatric conditions began during his service. *See, e.g.*, Tab 17 at AR 618; Tab 5 at AR 51. He believes Army medical providers misdiagnosed him. Tab 12 at AR 586.

On February 2, 2013, Plaintiff completed his enlistment contract and was subsequently honorably discharged. Tab 1 at AR 5 (Certificate of Release or Discharge); Tab 22 at AR 761. At the time of his discharge, he received a reentry code of 3, meaning the military found that he was likely deployable but may need a waiver, and his narrative reason for separation was "completion of required active service." Tab 1 at AR 5; *see also* Tab 22 at AR 761. Defendant avers that Plaintiff received this reentry code because he was overweight. Def.'s MJAR 14–15 (suggesting that "Mr. Jeanpierre's reentry code had nothing to do with his behavioral health

---

[4] *See generally Automated Logistical Specialist 92A*, U.S. Army, https://www.goarmy.com/careers-and-jobs/support-logistics/transportation-inventory/92a-automated-logistical-specialist (last visited Feb. 3, 2025).

symptoms and everything to do with the fact that he was out of compliance with the Army Body Composition Program at the time of his separation"); Tr. of Oral Argument at 21–22, *Jeanpierre v. United States*, 22-471 (2024) (hereinafter "Tr."), ECF No. 69.

### A.    Mr. Jeanpierre's Medical Records Document Mental Illness During his Service.

Mr. Jeanpierre identifies his experience in Afghanistan as a catalyst for his PTSD and psychosis. Tab 4 at AR 34; Tab 23 at AR 788. He asserts "[he] was dealing with excessive paranoia that stemmed from schizophrenia symptoms and thoughts." Tab 23 at AR 788. When he informed his leadership, he "was basically told to suck it up because [he] was about to ETS." *Id.* ETS refers to Expiration of Term of Service, i.e., the end of a service member's enlistment contract. Mr. Jeanpierre's medical records suggest that his leadership and treatment team were aware of his increasingly troubled mental state. *See* Tab 6 at AR 157–58, 462 (documenting that "RCF"[5] spoke with one of Plaintiff's providers expressing concern that he "appears in a depressed mood when seen out").

Plaintiff's medical records evidence that something changed after his return from Afghanistan to Germany in December of 2011. Prior to 2012, Mr. Jeanpierre neither required nor received mental health care.[6] *See generally* Tab 4 (January 6, 2021 ABCMR Report); Tab 6 (Plaintiff's medical records); Tab 10 (July 1, 2019 ABCMR Report); Tab 18 (Plaintiff's Human Resource records); Tab 22 (October 23, 2023 ABCMR Report). However, on January 9, 2012, he was first diagnosed with adjustment disorder and disturbance of emotions and conduct.[7] Tab 1 at AR 15; Tab 4 at AR 34; Tab 10 at AR 564–65. This began a cascade of mental health care appointments over the next year. In total, the record includes treatment notes from at least sixteen different mental health care appointments, which all occurred in the year prior to the end of Plaintiff's enlistment contract. *See* Tab 10 at AR 564–66 (chronicling thirteen of these appointments).

---

[5] RCF appears to refer to a RESPECT-Mil care facilitator, which is a healthcare professional in the military specifically trained to assist primary care providers with identifying and managing mental health conditions like depression and PTSD in service members. *See* Eunice C. Wong, et al., *Evaluating the Implementation of the Re-Engineering Systems of Primary Care Treatment in the Military* (RESPECT-Mil), Rand Health Quarterly vol. 5, 2 13 (Nov. 30, 2015).

[6] Mr. Jeanpierre also sought treatment for weight-related issues as early as 2010, and he began seeking treatment for back pain about two weeks after enlisting. *See, e.g.*, Tab 6 at AR 299 (containing treatment notes for consultation on losing weight), AR 382 (noting Mr. Jeanpierre's concerns about maintaining a healthy weight and lifestyle), AR 387 (denoting treatment for lower back pain on February 16, 2009), AR 169 (reflecting health care provider unable to determine if Plaintiff could return to the field given his spinal issues).

[7] Adjustment disorders are characterized by intense, excessive negative reactions to stress that involve strong emotions, stress, hopelessness, difficulty sleeping, and changes in behavior. *Adjustment Disorders*, Mayo Clinic (July 6, 2023), https://www.mayoclinic.org/diseases-conditions/adjustment-disorders/symptoms-causes/syc-20355224 (last visited Feb. 10, 2025).

As noted above, Mr. Jeanpierre's first mental health appointment occurred on January 9, 2012, after he returned from his deployment in Afghanistan. Tab 6 at AR 548. According to the treatment notes, Mr. Jeanpierre "discussed difficulties [he has] faced adjusting to being out of Afghanistan and back in Germany. Although [he] did not witness any particularly traumatizing event, [he] finds [himself] plagued by disturbing dreams and feelings of disorientation, along with anxiety since returning." *Id.* Mr. Jeanpierre reported he was "bothered by feeling down, depressed, or hopeless." *Id.* at AR 549. His provider also wrote that Plaintiff felt alienated from his family and church but noted that "[t]he visit was deployment related." *Id.* at 548. Mr. Jeanpierre was diagnosed with adjustment disorder with disturbance of emotions and conduct. *Id.* at AR 550.

He was next seen in a behavioral health clinic on January 26, 2012. *Id.* at AR 543–45. While his diagnosis remained the same, his provider noted that Mr. Jeanpierre presented with "anxiety regarding continued estrangement from father who does not approve" of his sexual orientation. *Id.* at AR 543. Mr. Jeanpierre asked to be placed on anti-depressants, but there were no appointments available at the time with a primary care manager. *Id.*

Mr. Jeanpierre next received behavioral health treatment on April 3, 2012. *Id.* at AR 555. The provider found that Plaintiff had trouble sleeping and he got "approximately 4–5 hours of continual sleep a night." *Id.* Mr. Jeanpierre was diagnosed with Secondary Insomnia, and the provider discussed the benefits of anti-anxiety medication. *Id.* at 555–57; *see also* 245–47 (duplicate medical record). In a separate visit that same day, a different provider noted Mr. Jeanpierre's mental health issues included "depression and anxiety" and that he had "returned from 3 week leave b/c of father's brain surgery." *Id.* at AR 540. *See also* Tab 10 at AR 565; Tab 22 at AR 766 (listing these two appointments on different days).

Treatment notes from May 1, May 7, May 15, and June 21, 2012 show Mr. Jeanpierre continued to struggle with anxiety and depression, sleep disturbances, irritability, and his feelings related to his father and his church. Tab 6 at AR 528, 534, 537, 552. At his May 7, 2012 appointment, Mr. Jeanpierre told his provider that he was "[u]nwilling to take meds for symptoms of depression (sleep disturbance, dysphoria, irritability) because of [a] dream [he] had that seemed to tell [him] not to take them." *Id.* at AR 534.

On June 21, 2012, a practitioner recorded that Plaintiff reported distress with his family and church and discussed corporal punishment within both. *Id.* at AR 525. Mr. Jeanpierre reported that he had stopped taking Prozac[8] on his own but wished to resume taking an anti-depressant. *Id.* The provider opined that Mr. Jeanpierre's "feelings of disorganization may be indicative of [an] underlying thought disorder." *Id.* Thought disorders are a symptom of schizophrenia.[9]

---

[8] Prozac is an antidepressant used to treat major depressive disorder. Sophia Entringer, *Prozac*, https://www.drugs.com/prozac.html (Nov. 21, 2023).

[9] Andrew M. Coleman, *A Dictionary of Psychology* (4 ed. 2015), *https://www.oxfordreference.com/display/10.1093/acref/9780199657681.001.0001/acref-9780199657681-e-8423?rskey=r6mxi9&result=8935*

On July 11, 2012, Mr. Jeanpierre was assessed by both a primary care provider and a psychiatrist for behavioral health issues. *See id.* at AR 462, 467. The primary care provider wrote that an RCF spoke with Plaintiff's healthcare team and expressed concern that he "appears in a depressed mood when seen out." *Id.* at AR 462. The provider notes Mr. Jeanpierre regularly cancels scheduled appointments and may have gone through a break-up. *Id.*

The psychiatrist believed that Mr. Jeanpierre "has been just answering 'no' to questions on forms so [he] doesn't have to take medications and does not want to be bothered." Tab 6 at AR 467. Plaintiff told the provider that he did not take his medications because he "had a dream that [he] turned into a zombie and [he] does not want to be a zombie." *Id.*

On August 21, 2012, Mr. Jeanpierre completed a PTSD screening test, and his primary care provider specifically diagnosed him with PTSD with moderate impairment. Tab 6 at AR 169. PTSD is a mental health condition caused by an extremely stressful or terrifying event; symptoms include nightmares, trouble sleeping and concentrating, irritability, severe anxiety, and uncontrollable thoughts.[10] Defendant asserts that this screening test "was not an approved means of assessment," meaning the diagnosis was invalid. Def's MJAR at 19 (citing Tab 1 at AR 19); *see also* Tab 22 at AR 774, 780. Neither the Army nor the ABCMR explain why this assessment was inadequate, especially given that the ABCMR ultimately concluded that Mr. Jeanpierre *did* have PTSD during his service. Tab 22 at AR 780.

On September 4, 2012, a separate provider noted a "Provisional Diagnosis: PTSD." Tab 6 at AR 447. The ABCMR noted that "[h]is most problematic areas were trouble concentrating and moving or speaking slowly or being restless," and "[h]e found it difficult to do his work, take care of things at home, or get along with others." Tab 22 at AR 767; Tab 6 at AR 444–47. Mr. Jeanpierre reported only sleeping two to three hours a night. Tab 6 at AR 444. The record reflects that Mr. Jeanpierre's sleep problems began after returning from Afghanistan. *Id.*

Two days later, at a September 6, 2012 psychology appointment, Plaintiff again reported receiving only two to three hours of sleep. *Id.* at AR 440. While he was prescribed Wellbutrin[11] by a therapist, he felt uncomfortable taking it. *Id.* He complained of "stress due to having to learn new things in [his] job, and not feeling supported by [his] family." *Id.* at AR 441. He noted he did not like an "exercise because the visual stimuli on the screen reminded [him] of images from [his] deployment." *Id.* at AR 440.

On September 10, 2012, Mr. Jeanpierre's medical records denote more serious mental and behavioral issues. On that day, Plaintiff was assessed for lower back pain—an ongoing issue he experienced while in the Army. *Id.* at AR 157–58. The provider, Steven Davis, was unable

---

[10] *Post-Traumatic Stress Disorder (PTSD)*, Mayo Clinic (Aug. 16, 2024), https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms-causes/syc-20355967 (last visited Mar. 19, 2025).

[11] Wellbutrin is a medication used to treat major depressive disorder and to prevent seasonal affective disorder. *Bupropion (oral route)* (March 1, 2025), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last visited on Mar. 19, 2025). *See also* Melisa Puckey, *Wellbutrin*, Drugs.com, https://www.drugs.com/wellbutrin.html (Aug. 15, 2023).

to evaluate him for his back pain because Mr. Jeanpierre expressed homicidal ideation during his appointment. *Id.* at AR 157. Mr. Davis noted that for the past month Mr. Jeanpierre experienced "a depressed mood" with "increased agitation." *Id.* Plaintiff told the provider that he "has been spoken to repetitively in a disrespectful manner w/ no tact in getting [him] to conform to Army hair standards." *Id.* Mr. Davis said Mr. Jeanpierre's mood "acutely worsened when [he] was forced to cut out nearly all of [his] hair to get rid of the texturizer that had been placed." *Id.* Then, concerningly, Mr. Jeanpierre stated that "since we are going to the field soon and [he] would have access to a weapon, if the situation were right [he] may be capable of killing these two individuals, although [he] denied having a plan" and suicidal ideation. *Id. See also id.* at AR 437 ("[He] reports thinking harmful thoughts about those [he] believes or [sic] causing [him] emotional harm."). Mr. Davis referred Plaintiff for a behavioral health consultation for further evaluation of his homicidal intent, writing "I did not feel comfortable not having [him] properly evaluated, especially since we were going to the field and [he] would have access to a weapon." *Id.* at AR 158.

A clinical social worker, William Kappel, who subsequently evaluated Mr. Jeanpierre that day observed that he appeared "frustrated at the constant harassment [he] believes [he] is experiencing from [his] unit." *Id.* at AR 438–39. While Plaintiff said he did not want to harm anyone, Mr. Jeanpierre noted: "I'm about to be in an environment where I will be given a gun" and that he is "bad with dealing with people who make fun of [him]." *Id.* Mr. Kappel documented that this frustration, coupled with his limited social supports and sleep issues, could "overwhelm [his] ability to cope resulting in more emotionally and [sic] ruminations about striking back." *Id.* at AR 439. Mr. Kappel further observed that Mr. Jeanpierre is a "thoughtful" soldier who can process consequences but "is angry at the embarrassment and berating [he] gets from a few of [his] Sr. leaders." *Id.* Plaintiff took another PTSD screening test and received a score similar to his August 21, 2012 exam where he was found to have PTSD. *Compare id.* at AR 435–36 *with id.* at AR 169. However, Defendant does not challenge the validity of the second exam. *See* Def's MJAR at 19 (challenging the August 21, 2012 PTSD diagnosis based on Plaintiff's "self-reported screening, which was not an approved means of assessment").

The social worker psychiatrically cleared Plaintiff to return to his duty station. *Id.* at 437. Mr. Jeanpierre, the social worker noted, was leaving the Army soon, and he "will not have a weapon issued to [him] nor be with any live ammunition." *Id.* Plaintiff reported continued struggles with sleep, physical pain, fitting in with his unit, and mood stability. *Id.* Plaintiff was escorted out by his squad leader. *Id.* at AR 157–58.

In a follow-up appointment a few days later on September 13, 2012, Mr. Jeanpierre reported that he "had issues this week and got very angry due to being picked on by [his] supervisor about [his] hair." *Id.* at AR 429. Plaintiff said he would not hurt anyone, but he "had some violent and angry thoughts." *Id.* Plaintiff again detailed issues with sleep since his deployment, as well as issues with his family and church. *Id.* at AR 429–31.

Finally, the record shows that during an appointment concerning his back on October 3, 2012, his provider noted that Mr. Jeanpierre did not understand the military disability process. *Id.* at AR 156. Plaintiff lacked "social support from [the] community" and did not feel supported either by his unit or his family. *Id.* at AR 155.

### B.    Mr. Jeanpierre's Mental Health Continued to Deteriorate After his Discharge.

On February 2, 2013, Mr. Jeanpierre was discharged.  Tab 1 at 5.  The majority of the facts in the Administrative Record about Mr. Jeanpierre's medical information from this time is contained within the Board's report.

In late February 2013, Plaintiff went to the emergency room requesting medication for anxiety and sleep.  Tab 22 at AR 770.  He was diagnosed with anxiety and adjustment disorder. *Id.*  The Board says he was assessed for PTSD but was not given a diagnosis.  *Id.*  In March 2013, he was diagnosed with anxiety disorder NOS.  *Id.*

In June 2013, about four months after Plaintiff was discharged from active duty, Mr. Jeanpierre was hospitalized with psychosis.  Tab 5 at AR 75; Tab 10 at AR 564; Tab 22 at AR 779.  Plaintiff contends that his psychosis was schizophrenia related.  Pl.'s Reply at 7.  His diagnosis remained adjustment disorder "because it was unclear at the time whether the psychosis was an isolated event."  Tab 22 at AR 779.  In September 2013, he was diagnosed again with adjustment disorder.  *Id.* at AR 770.

Mr. Jeanpierre was hospitalized again in October 2013 with psychiatric symptoms and reported a lack of sleep and dehydration.  *Id.*  That month, he was diagnosed with anxiety disorder NOS with a ten percent service connection by VA physicians.  *Id.* at AR 770–71.

In December 2013, Mr. Jeanpierre was diagnosed with depressive disorder NOS, psychosis NOS, and PTSD.  *Id.* at AR 771.  In March 2014, he was diagnosed with anxiety disorder.  Four months later, Mr. Jeanpierre was hospitalized when police found him wandering in public after he was missing for two days.  *Id.*  He was diagnosed with psychotic disorder NOS. *Id.*

In February 2015, he was hospitalized after odd behavior at a bus station and diagnosed with schizoaffective disorder.  *Id.*  That diagnosis was reaffirmed in September 2015.  *Id.*  The ABCMR acknowledges the VA diagnosed Mr. Jeanpierre with schizophrenia, schizoaffective disorder, major depression with psychosis, anxiety, and PTSD—all of which the VA believed were related to his experiences in Afghanistan.  Tab 10 at AR 564.  A VA psychiatrist noted that Mr. Jeanpierre's various diagnoses appeared to have begun while serving in the Army.  *Id.*  His VA medical records state that he is "100 percent service-connected disabled for psychosis, disorganized schizophrenia."  Tab 4 at AR 36; Tab 22 at AR 765.  The VA assigned a fifty percent disability rating for his PTSD.  Tab 4 at AR 31.

## III.    ABCMR Decisions and Previous U.S. Court of Federal Claims Proceedings

On May 10, 2017, Mr. Jeanpierre petitioned the ABCMR to correct the narrative discharge on his Certificate of Release or Discharge (DD Form 214).  Tab 16 at AR at 611–14; Tab 22 at AR 765–66.  He requested retroactive military retirement on the basis that while in the Army, he had mental health conditions that rendered him unfit to serve.  Tab 22 at AR  765–66.

Even though he was honorably discharged with a characterization of completion of required active service, Mr. Jeanpierre asked that his Certificate of Release or Discharge be corrected to show permanent medical retirement, which would entitle him to all benefits of a retiree.  Tab 16 at AR 611.  A Certificate of Release or Discharge is "the authoritative source of

information required for the administration of State and Federal laws applicable to personnel who have been discharged." *LaBonte*, 43 F.4th at 1369 (citing DoDI 1336.01 ¶ 4(a)). Alternatively, Mr. Jeanpierre requested medical retirement based on his post-service diagnosis of PTSD and schizophrenia. Tab 16 at AR 611. Since his petition, the ABCMR has considered Plaintiff's case three times.

### A.        July 1, 2019 and January 6, 2021 ABCMR Decisions

The Board first reviewed Mr. Jeanpierre's application on July 1, 2019. Tab 10 at AR at 562–71 (ABCMR's Record of Proceedings). It received a medical advisory opinion from Dr. Cynthia Shappell on behalf of the Army Review Boards Agency ("ARBA"). Tab 14 at AR 604–10. The Board denied Plaintiff's application on the basis that at the time of his separation from service, his mental health and back issues would not have warranted referral into the IDES system. *Id.* at AR 570–71. The Board did not apply liberal consideration. Tab 18 at AR 714–15.

The Board reconsidered Mr. Jeanpierre's application on January 6, 2021. Tab 4 (ABCMR Record of Proceedings); Tab 1 at AR 7–25 (duplicate ABCMR Record of Proceedings). The Board reviewed a second medical advisory opinion,[12] as well as additional documents. Tab 1 at AR 19–22. The Board did not apply liberal consideration in its analysis. *See* Def.'s MJAR at 22 (citing ECF No. 28). In two paragraphs of discussion, the Board again rejected Mr. Jeanpierre's request for military retirement. Tab 4 at AR 43. Plaintiff appealed.

### B.        Previous Proceedings at the U.S. Court of Federal Claims

Mr. Jeanpierre initially filed his appeal with the U.S. Court of Appeals for the Federal Circuit. *See* ECF. No. 1 at 3. The Federal Circuit transferred the case to the U.S. Court of Federal Claims. *Id.* After the Government filed a Motion for Judgment on the Administrative Record, the Federal Circuit decided a different case and held that even if a veteran was honorably discharged, military review boards must apply liberal consideration when determining whether he had a behavioral health issue. *Doyon*, 58 F.4th at 1244, 1246. Thus, since the ABCMR did not consider Mr. Jeanpierre's case under the liberal consideration standard, Defendant voluntarily requested remand so that the Board could correct this error. ECF No. 28.

On April 27, 2023, the Court granted the Army's Motion and remanded the matter to the ABCMR. Remand Order at 1, ECF. No. 29. The Court directed the ABCMR to consider "whether, under the 'liberal consideration' standard, PTSD or any other mental health condition contributed to the circumstances resulting in Mr. Jeanpierre's discharge, as provided in 10 U.S.C. § 1552(h)(2), and warrants a change in the narrative reason for Mr. Jeanpierre's discharge from the Army." *Id.*

---

[12] A copy of this Medical Advisory Opinion is not included in the Administrative Record, but the Opinion is summarized in the ABCMR January 6, 2021 Decision. *See* Tab 4.

### C.     The Board's October 13, 2023 Decision

#### 1.     Evidence Reviewed by the ABCMR

The ABCMR reviewed Mr. Jeanpierre's application for the third time on October 13, 2023. *See* Tab 22 at AR 760–86. It claims to have considered "the application, all supporting documents, and the evidence found within the military record" and applied liberal consideration to determine whether Mr. Jeanpierre "had a behavioral health condition (PTSD, schizophrenia, or another condition) while in service." *Id.* at AR 779. The Board states it considered "the entire record including medical records provided by the applicant, three ARBA medical advisories, two letters from the applicant's VA psychiatrist, and the applicant's statements made to his medical providers and made in connection with the present action." *Id.* at AR 779–80. It concluded that under a preponderance of the evidence standard, Plaintiff was not entitled to relief. *Id.* at AR 781–82.

The decision begins by summarizing Mr. Jeanpierre's mental health treatment from January 2012 through May 2020. *Id.* at AR 766–71. Concerningly, the summary refers to at least two appointments that are not in the record. *Id.* at AR 767–68 (describing treatment notes on November 7 and November 12, 2012). It also outlines, without citations, issues Plaintiff experienced adjusting to civilian life. *Id.* at AR 770. With no explanation of how it obtained this information or why it believed it was probative, the ABCMR recounts that Mr. Jeanpierre's mother reported that he traveled to Holland and used Hashish and that he continued to struggle with his sexual orientation after he left the Army. *Id.*

The Board notes that Plaintiff's Enlisted Record Brief, which is dated December 2, 2012, shows Plaintiff's PULHES Score as 111111. Tab 22 at AR 768. *See also* Tab 18 at AR 684 (Enlisted Record Brief). As the Army explains, "PULHES is a physical profiling system that rates individuals on a numerical scale from one to four in the following categories: Physical capacity or stamina, Upper extremities, Lower extremities, Hearing and ear, Eyes, and Psychiatric." Def.'s Reply at 6 n.2 (citing Army Reg. 40-501 ¶ 7-3(d)(1)). One is the highest score and denotes a service member had no impairment in that specific body system. *Id.*

Mr. Jeanpierre's score appears to conflict with the medical evidence in the record. *See, e.g.*, Tab 22 at AR 769–70 (noting Plaintiff was referred to the MEB for a back issue); Tab 6 at AR 157–58, 429–31, 437–39 (detailing psychiatric treatment in September 2012). And the separation physical examination that the score is drawn from is not included in the record. *See* Tab 6. *Compare* ECF No. 71 at 1 n.2 (stating the Army did not receive "any post-service VA records or Mr. Jeanpierre's separation physical" from the VA) *with* Tr. at 52–53 (stating the medical advisors had access to and reviewed the separation physical). Defendant supposes, without citing to anything in the record, that the PULHES score on Plaintiff's Enlisted Record Brief indicates "Mr. Jeanpierre attested that he had no issues during his separation physical." Def.'s Reply at 6 n.2 (citing Tab 18 at AR 684). *See also* Tr. at 44–45 (arguing that the "Enlisted Record Brief is the evidence" for why Mr. Jeanpierre was given a 1 rating for his mental health); Tr. at 53 (claiming that the medical advisors "all reviewed the separation physical and discussed that, at the physical, Mr. Jeanpierre himself reported that he was fit in all areas to include his behavioral health").

The Board reviewed two letters from Plaintiff's doctors at the VA, both of whom identified the rapid deterioration of his mental condition as sequela of his time and misdiagnosis in the Army.  In February 2018, Dr. Iva Timmerman wrote that Mr. Jeanpierre had been both an outpatient and inpatient at the VA since shortly after he was discharged.  Tab 17 at AR 618.  His diagnoses included "schizophrenia, schizoaffective c/o disorder, Major depression with psychosis, [and] anxiety with PTSD from Afghanistan" and these diagnoses "appear to have started *during [his] active duty time*."  *Id.* (emphasis added).  Dr. Timmerman noted that Mr. Jeanpierre was hospitalized for psychosis by June 2013, only a few months after he was discharged.  *Id.*  Dr. Timmerman believed that all of Mr. Jeanpierre's conditions "could have been diagnosed and treated prior to [his] discharge with a much-improved course early on."  *Id.*

In a letter from 2019, Dr. Raymond Cho informed the ABCMR that Mr. Jeanpierre received treatment for PTSD and schizophrenia at a VA medical center in Texas.  Tab 5 at AR 51.  Dr. Cho stated that the diagnosis of PTSD stemmed from symptoms including "re-experiencing through nightmares, avoiding sleep due to fear of nightmares, avoiding construction sites and large crowds, as well as suspiciousness, hostility and paranoia," which "were all experienced first *during his military service*."  *Id.* (emphasis added); *see also id.* at AR 61 (describing how Plaintiff has trouble driving through construction zones because they trigger him and make him feel like he is in a combat zone).

Finally, the Board reviewed the two previous ARBA medical advisory opinions from the 2019 and 2021 decisions, as well as a new advisory opinion from Dr. Ronnie Robinson.  Tab 24 at AR 790–92 (August 30, 2023 Medical Advisory Opinion) (noting that Dr. Robinson is not a medical doctor but holds a doctorate in psychology); Def.'s MJAR at 23.  Both Dr. Shappell's advisory opinion and the second medical advisory opinion found that Mr. Jeanpierre did not have PTSD or schizophrenia while in the Army and was not entitled to medical disability retirement.  Tab 15 at AR 605–10; Tab 4 at AR 35–42, Tab 1 at AR 19–22 (reviewing Plaintiff's post-service medical issues and concluding that "referral to DES is not recommended").

Dr. Shappell found that "[t]here is no documentation in [Plaintiff's] medical records . . . of [him] experiencing any obvious symptoms of psychosis such as hallucinations, paranoia, delusions, referential thinking, thought broadcasting, thought insertion or thought deletion."  Tab 15 at AR 609.  She remarks that Mr. Jeanpierre was not "hospitalized for recurrent psychiatric care while on active duty."  *Id.*  His duties were neither profiled and limited nor did the record reflect that his adjustment disorder diagnosis coincided with significant interference in military functioning.  *Id.* at AR 567.

In the second advisory opinion, the Medical Advisor reiterated that Mr. Jeanpierre would not have been referred to the IDES for evaluation.  *See* Tab 4 at AR 35–38 (containing ABCMR's summary of the second medical advisory opinion, which does not appear on its own in the record).  The Advisor dismissed the medical opinion by Dr. Cho, observing that Dr. Cho did not list a PTSD diagnosis until fifteen months after he began treating Mr. Jeanpierre.  *Id.* at AR 42.  Moreover, the Advisor opined that "the presence of behavioral health symptoms does not equate to having a disorder or being unfit at the time of separation."  *Id.*

Finally, Dr. Robinson concluded Mr. Jeanpierre should not receive medical disability retirement and asserted that "even under liberal consideration guidance, there is not support in

the records that the applicant had a condition that failed medical retention standards as outlined in Army Regulation 40-501 Chapter 3." Tab 24 at AR 791. Again, she stated she reviewed Mr. Jeanpierre's medical and personnel records, as well as the historical proceedings. Tab 22 at AR 772. Dr. Robinson expounded:

> Even if one grants that the applicant had PTSD or another mental health disorder(s) during service, there is no indication he was permanently profiled for the disorder(s), that Medical Retention Determination Point (MRDP) was met for the disorder(s), that he was psychiatrically hospitalized due to the disorder, or that the disorder caused significant interference in military functioning. In the absence of documentation demonstrating one or more of the above conditions for referral to IDES were met, there is no indication the applicant should have been separated through military medical channels, and insufficient evidence to support for [sic] a narrative reason change to reflect physical disability retirement.

Tab 24 at AR 791. She asserted that despite his post-service diagnoses of PTSD, schizophrenia, schizoaffective disorder depressed type, schizoaffective disorder NOS, catatonic schizophrenia, anxiety disorder, and depression, Mr. Jeanpierre's in-service records do not demonstrate "a mental health diagnosis during service that warranted referral to IDES." *Id.* at AR 792

### 2. The Board's Analysis

For a third time, the ABCMR denied Plaintiff's requested relief. Tab 22 at AR 779. The Board said it applied the liberal consideration standard to evaluate whether Mr. Jeanpierre had PTSD, schizophrenia, or another condition in service. *Id.* Breaking with the three medical advisory opinions, it concluded under a preponderance of the evidence standard that Mr. Jeanpierre had PTSD and adjustment disorder that manifested while he was in the military. *Id.* at AR 779–80. But it failed to explain why it determined Mr. Jeanpierre did not have schizophrenia. *See id.* at AR 779–82.

The ABCMR decided that Mr. Jeanpierre's PTSD did not contribute to his discharge because he was fit for service at the time of his separation from the Army. *Id.* at AR 780. As the ABCMR stated: "[e]ssentially, the Board is asked to apply liberal consideration to the question of whether the evidence shows the applicant should have been referred into the DES and medically retired." *Id.* The ABCMR decided that Mr. Jeanpierre would not have been referred to IDES. *Id.* at AR 781. In doing so, it weighed the ARBA medical advisors' opinions higher than VA psychiatrist Dr. Timmerman's statement and ignored Dr. Cho's opinion, both of which found that Mr. Jeanpierre's illnesses began during his military service. *See* Tab 17 AR 618; Tab 5 at AR 51. The Board also discounted Dr. Timmerman's finding that Plaintiff's conditions "could have been diagnosed and treated prior to his discharge with a much-improved course early on," *id.* (cleaned up), and Mr. Jeanpierre's statements about pressure from his command to ignore his mental health issues. *Id.*

### D. Current Proceedings

Mr. Jeanpierre filed an Amended Complaint in this Court on June 21, 2024. Am. Compl., ECF No. 58. His Motion for Judgment on the Administrative Record followed on July 26, 2024. Pl.'s MJAR. The Government filed an Amended Motion for Judgment on the

Administrative Record on August 30, 2024. Def.'s MJAR. The Court held oral argument on November 20, 2024. *See* Tr. at 1. Thereafter, the parties proposed stipulations for a voluntary remand on January 28, 2025. ECF No. 71. The Court now rules on the parties' motions, in part to give guidance to the review board on remand, and incorporates their proposed stipulations in the Opinion and Order below.

## IV.    Jurisdiction and Standard of Review

Plaintiff alleges violations of 10 U.S.C. § 1201, which is a money-mandating source of law. *Jones*, 30 F.4th at 1100. Accordingly, this Court has jurisdiction to hear such claims. *See* 28 U.S.C. § 1491(a)(1).

A motion for judgment on the administrative record allows parties to seek "the equivalent of an expedited trial on a paper record" that allows a court to engage in fact finding. *Young v. United States*, 497 F. App'x 53, 598 (Fed. Cir. 2012) (quotation omitted). The Court must inquire "whether, given all of the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Hassay v. United States*, 150 Fed. Cl. 467, 477 (2020) (quotation omitted). "As distinguished from summary judgment proceedings, genuine issues of material fact do not foreclose judgment on the administrative record." *Thomas*, 2025 WL 482164, at *12 (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

The Court reviews a military review board's decision narrowly based on the administrative record. *Walls*, 582 F.3d at 1367. Fitness determinations are properly made by the military. *Mote v. United States*, 110 F.4th 1345, 1354 (Fed. Cir. 2024) (citing *Heisig*, 719 F.2d at 1156). Thus, challenges to an administrative review board's decision are limited to whether that board's decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. 5 U.S.C. § 706(2); *Melendez Camilio v. United States*, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (citation omitted); *Young*, 497 F. App'x at 58 (citing *Heisig*, 719 F.2d at 1156). This is a deferential standard. *Valles-Prieto*, 159 Fed. Cl. at 616 (citing *Chambers*, 417 F.3d at 1227).

"An agency's decision is arbitrary and capricious when the agency decision-maker 'entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Kelly*, 69 F.4th at 894–95 (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). When the agency "cherry-pick[s] which evidence to consider" or does not consider all competent evidence "whether or not it supports the challenged conclusion," it has erred. *Valles-Prieto*, 159 Fed. Cl. at 617–18 (quoting *Heisig*, 719 F.2d at 1157).

As explained above, review boards are required to evaluate claims related to behavioral health disabilities under liberal consideration. *See, e.g.*, Kurta Memo; 10 U.S.C. §1552(h). But generally, a military review board's decision must be "supported by substantial evidence on the record considered as a whole." *State Farm Mut. Auto. Ins.*, 463 U.S. at 44 (internal quotation marks and quotations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Strand v. United States*, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (internal quotations omitted). To satisfy the substantial evidence standard,

a review board must offer more than a "naked conclusion and mere recitation" that it has analyzed the evidence. *Robbins v. United States*, 29 Fed. Cl. 717, 728 (1993) (quoting *Beckham v. United States*, 183 Ct. Cl. 628, 636 (1968)).

If a review board "lacked the benefit of . . . critical information, its decision is not supported by substantial evidence." *Frey v. United States*, 112 Fed. Cl. 337, 348 (2013). To meet the substantial evidence standard, a board must explain in writing the reasoning that underlies its decision. If the Board "[does] not disclose[] its reasons for . . . ignoring" or "disregard[ing] certain record evidence," and the Court is "unable to discern why," remand is appropriate. *Hatmaker v. United States*, 127 Fed. Cl. 217, 237 (2016). *See also Fuentes v. United States*, 157 Fed. Cl. 433, 455 (2021) (finding decision arbitrary and capricious when it "evaluated only certain of [a] plaintiff's medical records during his service"). So while a military review board is "not required to discuss each of [a plaintiff's] medical records," it must "review the complete case record" and "provide a reason for . . . [its] failure to consider certain" relevant evidence. *Hatmaker*, 127 Fed. Cl. at 235–36.

The military must also follow its own procedural regulations. *Id.* at 228 (citing *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993)). *See also Heisig*, 719 F.2d at 1156. This includes applying the liberal consideration standard when cases involve PTSD. *See Doyon*, 58 F.4th at 1246.

## V.     Discussion

Military review boards "are obligated to examine relevant data and articulate a satisfactory explanation for their decisions." *Rominger v. United States*, 72 Fed. Cl. 268, 273 (2006) (internal quotation marks and quotation omitted). "This includes making rational connections between the facts found and the choices made." *Van Cleave v. United States*, 66 Fed. Cl. 133, 136 (2005) (quotation omitted). Here, careful review of the Administrative Record reveals that Mr. Jeanpierre's mental condition began deteriorating after he returned from Afghanistan, which was about a year before his discharge from the Army. And the record indicates that either Mr. Jeanpierre's condition dramatically worsened in the few months after his discharge, or he finally received an accurate diagnosis from non-Army medical providers upon leaving the Army.

The Board largely failed to grapple with how this troubled record accurately reflected Mr. Jeanpierre's fitness for continued service. It is also problematic that some of the documents upon which the Board purports to rely do not appear in the Administrative Record. The Board's decision "was not based on the record as a whole, and its findings are not supported by substantial evidence." *Thomas*, 2025 WL 482164, at \*18. Further, the Board did not correctly apply liberal consideration to either its evaluation of whether Mr. Jeanpierre had mental health issues during service or its fitness determination.

### A.     Incomplete Administrative Record

The Administrative Record lacks critical documents that the Board purports to have reviewed in its analysis of Mr. Jeanpierre's case. The Board attests that it "considered the entire record including the medical records provided by the applicant, three ARBA medical advisories,

two letters from the applicant's VA psychiatrist, and the applicant's statements made to his medical providers and made in connection with the present action." Tab 22 at AR 779–80. The Administrative Record must include these documents. *See generally* Rules of the Court of Federal Claims (hereinafter "RCFC") 52.1; RCFC Appendix K.

Defendant argued, without citing to authority, that it was Plaintiff's burden to provide the numerous missing documents in the Administrative Record. Tr. at 53. Defendant concedes that the ARBA medical advisors, whose opinions were incorporated into the ABCMR's decision, "[had] access to every single medical record that the Army has on Mr. Jeanpierre." *Id.* at 52–53. The absence of these documents from the record thwarts meaningful judicial review of the Board's decision. From the ABCMR's record of proceedings, it appears both the Board and the ARBA medical advisors had access to these records—and in fact reviewed and relied upon them. That means they should have appeared in the Administrative Record.

Similarly missing from the Administrative Record are Plaintiff's VA records, a behavioral health screening from October 2012 as part of an MEB process for his back injury, a December 2012 visit to a military treatment facility for a sleep aid, and Mr. Jeanpierre's separation physical. *See* Tab 22 at AR 769–70 (detailing these evaluations), AR 765 (detailing Plaintiff's VA records); Tr. at 52–53 (stating the medical advisors had access to and reviewed the separation physical).

The ABCMR says it reviewed two documents from November 7 and November 12, 2012. Tab 22 at AR 767–68.[13] The Board indicates that these documents contain treatment notes related to Mr. Jeanpierre's ongoing behavioral health issues. *Id.* These records fall at a crucial time in Plaintiff's tenure at the Army. The appointments occurred soon after he stated he "may be capable of killing . . . two individuals" and shortly before he separated from the Army in February 2013. Tab 6 at AR 157–58.

In reviewing the ABCMR's decision, the Court must determine "whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig*, 719 F.2d at 1157. "An agency abuses its discretion when it renders a decision 'based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors.'" *Beck v. Dep't of Navy*, 997 F.3d 1171, 1182 (Fed. Cir. 2021) (citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)). And the Board must consider "*all* of the competent evidence . . . , whether original or supplemental, and whether or not it supports the challenged conclusion." *Heisig*, 719 F.2d at 1157 (citations omitted); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 31–32 (holding that in reviewing an agency's explanation of its actions, "a court must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment"). To determine whether the ABCMR's actions were arbitrary and capricious, the Court must be able to review these missing records.

---

[13] The Board also reviewed two records concerning treatment for Plaintiff's back pain that are missing in the record. These appointments occurred on October 24, 2012 and November 19, 2012.

**B.    Missing DA Form 3349 and Separation Physical**

Similarly problematic, the Board—and the ARBA medical advisors' opinions—refer to and rely on Plaintiff's PULHES score from his Enlisted Record Brief to establish his fitness shortly before his separation. Plaintiff's application to the Board did not include a DA Form 3349, which is a record that documents a soldier's physical profile through a PULHES score. Tab 10 at AR 562–71. Defendant contends that the Enlisted Record Brief documents the separation physical's outcomes. Tr. at 44–45. In that way, the Enlisted Record Brief is a record similar to the Certificate of Release or Discharge, DD-214. An Enlisted Record Brief reflects the events of the past. *See LaBonte*, 43 F.4th at 1369. It does not "establish those events or bring them into being" but instead "documents that they have occurred or taken place." *Id.*

In Mr. Jeanpierre's case, the Enlisted Record Brief shows that he received a PULHES score of 111111—a perfect score in every category, including "Psychiatric." Tab 18 at AR 684 (listing Plaintiff's PULHES score and his last physical exam as October 31, 2012). His Enlisted Record Brief does not reflect why he received this score. *See id. See also* Tr. at 50 (arguing that the separation physical and the ratings that are based on it "indicat[e] that he attested that he had no issues during his separation physical and that he possessed a high level of medical fitness"). But *why* he received that score is highly relevant and important to the ABCMR's inquiry and the Court's review of the Board's decision. The record shows that the Army identified at least three ongoing medical problems with Plaintiff prior to his discharge: adjustment disorder, a weight issue, and pain in his lumbar spine. These issues are not reflected in this score.

The record medical evidence also establishes that Mr. Jeanpierre experienced significant issues with his lumbar spine prior to his discharge—he even began the IDES process. Tab 22 at AR 769–70. Plaintiff received a reenlistment code of 3, meaning he had a condition for which he would require a waiver if he attempted to reenlist. Defendant explains this was due to his weight. Def.'s MJAR 14–15; Tr. 21–22. Finally, the record shows that Mr. Jeanpierre experienced significant mental health issues in his last year of service. He threatened members of his chain of command roughly a month before his separation physical, held a diagnosis of adjustment disorder, experienced symptoms of psychosis, suffered from disruptive sleep problems, would not be issued a weapon, was prescribed an antidepressant, and feared turning into a zombie. *See* Tab 6 at AR 157–58, 429–31, 437–39. It is not clear why none of these issues were reflected in his PULHES score. *See* Tab 18 AR 684.

The Board cannot rationally rely on Plaintiff's perfect PULHES score without addressing its inconsistency with the contemporaneous record evidence that showed Mr. Jeanpierre suffered from serious medical issues. "Under the substantial evidence rule, *all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion." *Heisig*, 719 F.2d at 1157 (citations omitted). The Board's decision does not address the contradictions between Plaintiff's extensive in-service medical records and the scores on his Enlisted Record Brief. *See* Tab 22. And it is difficult to see how the Board could meaningfully interrogate these discrepancies without the underlying DD Form 3349 or separation physical, which neither party possesses. ECF. No. 71 at 1 n.2. If a review board "lacked the benefit of . . . critical information, its decision is not supported by substantial

evidence." *Frey*, 112 Fed. Cl. at 348.  Thus, the Board erred by relying on the PULHES score from the Enlisted Record Brief without contrasting it to the rest of the evidence in the record.

### C.    The Board Improperly Weighed the Evidence Under Both the Substantial Evidence and the Liberal Consideration Standards.

The Record of Proceedings contains little information about how the Board weighed the evidence in the record, and it is unclear whether the Board applied liberal consideration throughout its analysis.  *See* Tab 22.  The ABCMR says it employed the liberal consideration standard to its decisions about whether Plaintiff suffered from behavioral health issues during his service and whether those issues made Plaintiff unfit to continue in his role in the Army.  Tab 22 at AR 780.  But "the presence or absence [of] the phrase 'liberal consideration' should not dictate whether liberal consideration was actually applied."  *Bee*, 2024 WL 3912596, at *9.

Liberal consideration requires a Board to "robustly engage with the evidence specifically affecting the veteran, not run away from it."  *Id.* at *10 (citing *Doyon*, 58 F.4th at 1235–49).  It compels the ABCMR to consider evidence more broadly and favorably than it would under the substantial evidence standard, but "it does not prevent the Board from weighing the evidence or discounting evidence in support of Plaintiff's disability retirement claim if the Board in fact provides articulable and legitimate reasons for doing so."  *Id.* at *9.  At a minimum, the ABCMR must address the evidence that "medical experts relate directly to the plaintiff's time in service and explain why the judgments of those experts are not worthy of respect."  *LaBonte*, 2023 WL 3197825, at *10.  Further, the ABCMR must consider that a veteran's testimony alone may establish the existence of a condition, use VA determinations as persuasive evidence that a condition existed during service, and take seriously the opinions of post-service medical providers.  *See* Kurta Memo Attach. at 2.  And "[e]vidence that may reasonably support more than one diagnosis should be liberally considered as supporting a diagnosis, where applicable, that could excuse or mitigate the discharge."  *Id.*  Here, "while the Board paid lip service to the requirement that [Plaintiff's] claims be given liberal consideration, in practice it failed to actually do so."  *Thomas*, 2025 WL 482164, at *19.

#### 1.    Mental Illnesses

The Board failed to apply liberal consideration to both its evaluation of whether Mr. Jeanpierre had certain behavioral health issues at the time of his discharge and whether those illnesses made him unfit for continued service.  *See* Tab 22.  It claims to have "applied liberal consideration to evaluate whether the applicant had a behavioral health condition (PTSD, schizophrenia, or another condition) while in service."  Tab 22 at AR 779.  And it concludes "the preponderance of the evidence shows the applicant had two behavioral health conditions, adjustment disorder and PTSD, that first manifested during military service."  *Id.* at AR 780.  But the Board fails to explain the basis for these conclusions.  *See id.* at AR 779–80.

In the Board's record of its decision, it does not expound upon why it determined Mr. Jeanpierre did not have schizophrenia.  It does not spell out why it decided he had PTSD or adjustment disorder.  It does not weigh the medical advisory reports against the evidence.  *See* Tab 22.  It does not discuss the evidence in Plaintiff's Army medical records or the comments

and diagnoses of Plaintiff's psychiatrists at the VA.  *See id.*  It does not consider whether the evidence suggests Mr. Jeanpierre had PTSD and another behavioral health condition such as schizophrenia.  *See id.*  And while the Board cites to Plaintiff's affidavit attesting to his struggles in Afghanistan, it does not say how it used or evaluated this evidence.  *See* Tab 22 at AR 779–80.

The ABCMR's 2023 decision "failed to demonstrate a rational reason for finding certain items of evidence persuasive, while disregarding or minimizing others."  *Fuentes*, 157 Fed. Cl. at 463.  Its action is arbitrary and capricious since "the [B]oard entirely fails to consider an important aspect of a problem, [and] offers an explanation for its decision that runs counter to the evidence before the board."  *Van Cleave*, 66 Fed. Cl. at 136 (citation omitted).  And the ABCMR merely offers a "naked conclusion and mere recitation" that it has analyzed the evidence.  *Robbins*, 29 Fed. Cl. at 728 (quoting *Beckham*, 183 Ct. Cl. at 636).

The Court concludes that the Board committed legal error by failing to give liberal consideration to Mr. Jeanpierre's claims as required by statute and DoD memoranda.  *See* 10 U.S.C. § 1552(h); *Doyon*, 58 F.4th at 1245.  Moreover, the ABCMR's decision was not supported by substantial evidence because it did not "articulate a satisfactory explanation" for its choices.  *Rominger*, 72 Fed. Cl. at 273 (internal quotation marks and quotation omitted).

## 2. Fitness for Service

### a. Three Incorporated Medical Advisory Opinions

As noted above, the Board found that even though Mr. Jeanpierre had PTSD at the time of his separation from the Army, he was fit to serve. Tab 22 at AR 765–66.  To begin its analysis, the ABCMR recited the standard for medical fitness under Army Regulation 40-501 and noted that the three ARBA medical advisory opinions found that Plaintiff "did not have an unfitting condition while in service." *Id.* at AR 780–81.  The Board does not address the fact that in several instances the advisory opinions conflict with the contemporaneous medical treatment notes in the record.  *See* Tab 22.

For example, in Dr. Shappell's advisory opinion, the staff psychiatrist observed that "[t]here are no documents in [Plaintiff's] medical records showing he experienced any obvious symptoms of psychosis such as hallucinations, paranoia, delusions, referential thinking, thought broadcasting, thought insertion or thought deletion."  Tab 10 at AR 567.  *See also* Tab 22 at AR 780 (relying on this finding to justify the ABCMR's fitness decision).  Dr. Robinson made similar claims. Tab 24 at AR 791–92 ("[T]here is no documentation in the applicant's service records that supports psychosis or the presence of a psychotic disorder during service.").

But these assertions are contradicted by the evidence in the medical record.  Plaintiff's medical records from 2012 show that he feared turning into a zombie, leading him to not take his prescribed psychiatric medications. Tab 6 at AR 467.  A care provider noted that Mr. Jeanpierre's "feelings of disorganization may be indicative of [an] underlying thought disorder." *Id.* at AR 525.  Plaintiff expressed he was capable of harming and killing other service members. *Id.* at AR 157–58, 429–31, 437–39.  The Board neither addresses this evidence in its decision nor explains why Mr. Jeanpierre's homicidal ideation, refusing to take psychiatric medication, or fear of becoming a zombie made him fit to continue to serve in the Army.  *See* Tab 22.

Dr. Shappell's advisory opinion also notes that Plaintiff's duties were not profiled or limited, and his personnel records do not show significant interference in military functioning. Tab 15 at AR 609. Yet in September 2012 when Mr. Jeanpierre confessed to thoughts of killing coworkers, the social worker who evaluated him psychiatrically cleared him to return to his duty station in part because he "[would] not have a weapon issued to [him] nor be with any live ammunition." Tab 6 at AR 437.

The Board did not address how the social worker's determination that Plaintiff should not have a gun impacted its fitness determination. *See* Tab 22 (failing to note that a condition of Mr. Jeanpierre's return to service was that he would not be armed). *See also Thomas*, 2025 WL 482164, at *18 (finding that a military review board's analysis was insufficient under the substantial evidence standard when it failed to consider that a veteran had been disarmed in its fitness analysis). Nor did it explain why this incident, which on its face appears unfitting, did not "significant[ly] interfere[] in military functioning," Tab 10 at AR 567, nor constitute a "decided medical risk to the health of the member or the welfare or safety of other members" of the military. DoDI 1332.38 E.3 P.3 ¶ 2.2.1.

The Army offers a post hoc explanation, claiming that "[i]f every soldier were allowed to go to a doctor and say that, you know, they aren't feeling well and they might shoot someone, then this would cripple the entire Disability Evaluation System." Tr. at 36–37. But the ABCMR did not offer this explanation in its Record of Proceeding, and that is the decision this Court reviews. In short, the Board does not explain why, despite these issues, the advisory opinions are dependable or more persuasive than other evidence in the record. This is arbitrary and capricious.

### b. Enlisted Record Brief and Performance Evaluations

Continuing with its evaluation, the Board notes that Mr. Jeanpierre experienced "family issues, work related stress, and possible homicidal ideation," as well as "sleep problems and some anxiety and depression." Tab 22 at AR 781. It then relies on Mr. Jeanpierre's Enlisted Record Brief, noting the document shows that his last physical exam was on October 31, 2012, and his health profile did not show impairment. *Id.* As noted above, if the Board believed that the information recorded on the Enlisted Record Brief is significant in its fitness analysis, it needed to contrast the underlying medical examinations with the other record evidence that, on its face, conflicts with the perfect PULHES score.

The Board says it "could not locate any documentation that the applicant was struggling with the performance of his military duties or presented a threat to himself and others." *Compare id. with* Tab 6 at AR 157–58 ("[Plaintiff] states that since we are going to the field soon and would have access to a weapon, if the situation were right [he] might be capable of killing these two individuals"), 429–31 (noting Plaintiff "continues having sleep problems" and "had some violent and angry thoughts"), 437–39 (documenting that Plaintiff "reports thinking harmful thoughts about those [he] believes [are] causing [him] emotional harm" and "reports continued struggles with [his] sleep, mood, stability, physical pain, and fitting in with [his] unit"). "[W]hile performance evaluations are relevant to whether a service member is fit for duty, it is error to place exclusive reliance upon them where there is other contrary evidence in the record." *Compare Hassay*, 150 Fed. Cl. at 479–80 *with* Tr. at 56 (noting Defendant's

argument that "there's nothing on the record to indicate that [Plaintiff] was not performing his duties").

Again, the ABCMR does not address how Mr. Jeanpierre's homicidal ideation and that he was psychiatrically cleared to return to service at least in part because he would not have a weapon neither affected performance of his military duties nor presented a threat to others. In fact, the Board does not meaningfully address Mr. Jeanpierre's duties in 2012 after his deployment at all. *See* Tab 22. The Board also does not refer to or discuss in detail any of Plaintiff's performance evaluations. *See id.* at AR 780.

### c. Post-Service Medical History and Mr. Jeanpierre's Statements

The Board next reviewed the timing of Mr. Jeanpierre's first post-deployment hospitalization and hypothesized that a number of other stressors could have caused the incident. This includes his family and church's reaction to his LGBTQIA identity and his mother's report of his recreational drug use. Tab 22 at AR 781. While the ABCMR, with no evaluation of their credibility, relied on Mr. Jeanpierre's mother's statements about his drug usage, it discounted his statements, including his assertion that he was dissuaded from pursuing the medical disability retirement process for his mental health conditions because his enlistment contract would end soon. *See id.* The Board opined that "this and other statements, many years after the fact and contrary to the contemporaneous medical and performance records, [are] less persuasive than the records and the opinions of the three medical advisors." *Id.* According to the ABCMR, "there was insufficient evidence at the time of the applicant's voluntary separation that he had a medical condition that would have compromised or aggravated his health if he had remained in the military." *Id.*

The Board's findings ignore that "[t]he veteran's testimony alone, oral or written, may establish the existence of a condition or experience, that the condition or experience existed during or was aggravated by military service, and that the condition or experience excuses or mitigates the discharge." Kurta Memo Attach. at 2; Wilkie Memo Attach. at 2. Review boards must apply liberal consideration to provide veterans justice for "invisible wounds" that are "some of the most difficult cases to review" even if "the mental health condition was not diagnosed until years later." Kurta Memo; *see also Hassay*, 150 Fed. Cl. at 480 (citing Hagel Memo) (noting that "the Department of Defense has recently recognized, because disorders like PTSD were until recently not well understood, they are often not diagnosed until many years after they manifest themselves"). So while the Board may discount Mr. Jeanpierre's evidence, it must explain why the passage of time alone makes Mr. Jeanpierre's statements less persuasive. The Board committed legal error because it did not comply with DoD regulations when evaluating this evidence.

### d. VA Medical Opinions

The Board concludes its analysis by reviewing one of the two statements from Mr. Jeanpierre's VA providers. It found that Dr. Timmerman's assessment that Plaintiff's behavioral conditions could have been diagnosed while he was in the Army was "speculative, unsupported by evidence, and less persuasive than the opinions of the ARBA medical advisors." Tab 22 at AR 781; Def.'s MJAR at 35 (noting that the Board "gave greater weight to the contemporaneous statements Mr. Jeanpierre made to his in-service physicians and to the results of his medical

examination conducted contemporaneously with his discharge from the Army" despite the fact that the medical examination does not appear in the Administrative Record); Tr. at 38 (stating that the Board found its view on the cause of Mr. Jeanpierre's psychosis more probative than the treating psychiatrist's view).  The Board does not say why or how it came to these determinations, and it does not discuss the medical opinion from Dr. Cho at all or any other VA medical records it reviewed.  *See* Tab 22 at AR 779–82.  Importantly, both VA providers concluded that Mr. Jeanpierre suffered from PTSD and schizophrenia that began while he was in the Army.  Tab 5 at 51; Tab 17 at AR 618.  And, while the Board relies on the results of Mr. Jeanpierre's discharge medical exam, Defendant has not provided that exam or otherwise explained its absence from the record.

The ABCMR did not give the VA opinions a full or fair weighing, and it "did not wrestle with or seek to explain why these medical opinions should not be followed." *Labonte*, 2023 WL 3197825, at *9 (citation omitted).  "[M]edical opinions regarding a veteran's PTSD . . ., even those by civilian doctors post-dating a veteran's service, require liberal consideration." *Id.*  An advisory opinion from a VA provider "is no less relevant because it is based on [her] treatment of [Plaintiff] many years after he left the service." *Hassay*, 150 Fed. Cl. at 480 (citing *Walter v. United States*, 358 F.2d 957, 962 (Ct. Cl. 1966)).  And the Kurta Memorandum unequivocally instructs review boards that "[a]bsent clear evidence to the contrary, a diagnosis rendered by a licensed psychiatrist or psychologist is evidence the veteran had a condition that may excuse or mitigate the discharge."  Kurta Memo Attach. at 2.  "A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing (as here), is inimical to a rational system of administrative determination and ultimately inadequate." *Beckham*, 183 Ct. Cl. at 636 (citations omitted).  The Board's failure to properly consider the VA doctor's opinions was contrary to law and did not comply with DoD regulations.

Ultimately, the Army has not "articulate[d] a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (internal quotation marks and quotation omitted).  Thus, the Court finds that the ABCMR did not act reasonably or in accordance with law.

## VI.    Conclusion

For the reasons above, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 59, and **DENIES** Defendant's Amended Cross-Motion for Judgment on the Administrative Record, ECF No. 61.  This case is once again remanded to the Board for an in-depth consideration of plaintiff's fitness based on the entire medical record and all of plaintiff's existing medical conditions at the time he was discharged under the liberal consideration standard.

In conducting its review, the Board shall, consistent with this opinion:

1)  Place on the administrative record any and all records or documents it relies on or reviews in making its determinations.  Any documents reviewed or referenced by either the ABCMR or by a medical advisor at the ARBA must appear in the record.  That includes Mr. Jeanpierre's VA electronic medical record, military electronic medical record, and military electronic personnel record, which have been reviewed and referenced by either the Board and the ARBA at various points throughout this litigation.  *See, e.g.*, AR 606.  These records must

include Mr. Jeanpierre's behavioral health records from November 7, 2012; November 12, 2012; and November 29, 2012.

2) Place Mr. Jeanpierre's separation physical on the administrative record. If record of his separation physical is not available, the Board may not rely on information drawn from that physical, including Mr. Jeanpierre's assigned PULHES score on his Enlisted Record Brief, to determine what the separation physical may have shown about his fitness at the time of discharge.

3) Allow Mr. Jeanpierre to place on the administrative record any other medical records he deems appropriate.

4) Allow Mr. Jeanpierre to make any arguments concerning his claim that he is entitled to correction of his military records to reflect a medical retirement from the United States Army, effective February 2, 2013, due to a behavioral health condition.

5) Reconsider its decision dated October 13, 2023, in light of the new administrative record and Plaintiff's arguments on remand. In its new decision, the Board shall explain the impact, if any, of Mr. Jeanpierre's reentry code of 3 on its decision.

The remand proceeding must be completed within **three months** of the date of this decision. The parties shall file a joint status report every **forty-five days** advising the Court of the status of the proceedings on remand.

The Court will retain jurisdiction over the case during the course of the proceedings on remand. The Court **STAYS** proceedings in the instant case during that time. Pursuant to Rule 52.2(e), within thirty days after the filing of the final decision or other action on remand, the parties shall file notice of the remand outcome. They must explain whether that decision affords a satisfactory basis for the disposition of the case or whether the parties require further proceedings before the Court, and if so, the nature of such proceedings.

The Clerk of the Court is directed to serve a copy of this order to:

Mr. Mark F. Averill                         Joseph Lister, Director
Acting Secretary of the Army                Army Board for the Correction of Military Records
Office of the Secretary of the Army         Army Review Board Agency
101 Army Pentagon                           251 18th Street South – Suite 385
Washington, DC 20310-0101                   Arlington, VA 22202-3531


**IT IS SO ORDERED.**


 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge

25